Case 3:12-mj-03157-DGW *SEALED* Document 3-1 Filed 09/28/12 Page 1 of 17 Page ID #37
Case 3:12-mj-03157-DGW *SEALED* Document 1 Filed 09/28/12 Page 1 of 17 Page ID #5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS



FILED
SEP 28 2012
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| ) | |
| Silver 2005 BUICK 4 DOOR, IL REG - K141445 ) | CASE NUMBER 12-mj-3157-DGW |
| ) | |
| WHICH IS WITHIN THE SOUTHERN ) | |
| DISTRICT OF ILLINOIS ) | FILED UNDER SEAL |
| ) | |

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

I, Derek Wingle, being duly sworn states:

I am a Special Federal Officer with the Federal Bureau of Investigation and have reason to believe that within the vehicle further described as:

### Silver 2005 BUICK 4 DOOR, IL REG - K141445

located in within the Southern District of Illinois there is now concealed certain property, namely:

### See the attached list entitled "Attachment A, Items to be Seized"

which constitutes evidence of the commission of a criminal offense or fruits of the crime, or things otherwise criminally possessed, or which is designed or intended for use or which is or has been used as the means of committing the following offense: in violation of Title 18, United States Code, Section 666 (embezzlement from a local government that receives federal funds.)

1

1. I am a Special Federal Officer with the Federal Bureau of Investigation (FBI) and have been since May of 2010. During this time, I have conducted and assisted with criminal investigations concerning violations of Title 18 of the United States Code. In addition, I have been employed as an Illinois State Trooper since 2006. I have approximately nine years of law enforcement experience. I am currently assigned to the Springfield Division of the FBI, Fairview Heights Resident Agency (FHRA), assigned to work as a part of the Metro-East Public Corruption Task Force (MEPCTF), and as such am vested with the authority to investigate violations of Federal criminal laws, including Titles 18 and 21, United States Code. I have investigative responsibilities for crimes occurring in the Southern District of Illinois. I have received training and experience on probable cause as it relates to search and seizure warrants, and methods and practices of executing such warrants. I have assisted in the execution of search warrants of personal residences and businesses for evidence relevant to ongoing criminal investigations.

2. Your affiant is currently investigating the activities of James S. Bedell, the "Director of Police" for the City of Edwardsville Police Department.. I make this affidavit in support of a warrant to seize the items set forth in Attachment "A" from inside of the Edwardsville Police Department located at 400 N. Main Street, Edwardsville, Illinois, for a warrant to search the residence of James Bedell, located at 324 Shea Court, Edwardsville, IL and for a warrant to search the vehicle used by Bedell for his work for the Police Department. The Police Department is a two story brick structure standing at the northeast corner of Main Street and High Street in Edwardsville, Illinois and is attached to the Edwardsville Fire Department Main Street Station. The residence is a 1 ½ story brick residence in a residential neighborhood purchased by Bedell in approximately March of 2012 for 305,000.

3. The information upon which this affidavit is based includes my training and experience, information obtained from witness interviews, and further investigation information conducted by FBI Agents and other law enforcement officers. This affidavit is being submitted for

2

the purpose of obtaining a search warrant to seize the items set forth in Attachment "A" from inside of the Edwardsville Police Department located at 400 N. Main Street, Edwardsville and inside 324 Shea Court, Edwardsville, Illinois. Because this affidavit is submitted for the limited purpose of establishing probable cause to obtain a search warrant, I have summarized a number of investigative findings, but I have not included the details of every aspect of the investigation. The facts to support the issuance of a search warrant for the premises described above are as follows:

## BACKGROUND

**The Investigation:**

4. James S. Bedell has been employed as the Director of Police for the City of Edwardsville, Illinois since approximately 2007. City of Edwardsville publications also refer to Bedell as the Chief of Police.

5. Based on preliminary information from reliable sources within the City of Edwardsville Police Department, in April of 2012 a federal investigation was instituted concerning allegations that James S. Bedell was embezzling funds from the City of Edwardsville that were received by the City as payment of administrative fees for towed and impounded vehicles.

6. 625 ILCS 5/11-208-7 provides generally that municipalities may provide by ordinance procedures for the release of properly impounded vehicles and for the imposition of a reasonable administrative fee. The City of Edwardsville charges a $300 fee for vehicles towed as a result of certain enumerated violations. The $300 administrative fee must be paid by cash or money order and the paid administrative fee is revenue to the City which must be properly accounted for and therefore the funds received are not for the personal use of an employee of the City of Edwardsville.

**Interview of ▮▮▮▮▮▮▮▮▮▮ #1:**

7. On April 6 and 9, 2012, ▮▮▮▮▮▮▮▮▮▮ #1 contacted Affiant and asked if subpoenas were served by the F.B.I. against the City regarding vehicle impound fees

3

charged by the Police Department. [Civil subpoenas had been received by the City pertaining to a class action civil suit concerning the administrative tow fees.] ▮▮▮ #1 advised that there was a concern of corruption within the Police Department. ▮▮▮ #1 advised that ▮▮▮ #1 had learned that receipts for the vehicle impound fees were erased or no longer available for impounded vehicles prior to January 2012. The Police Department had been charging a $300.00 flat fee for vehicles impounded by the department. To collect the fees after a vehicle had been impounded, the party responsible for the vehicle's release would come to the police department and pay $300.00 to the dispatcher. The dispatcher would then provide the responsible party with a receipt and place the $300.00 into the impound fee lock box in the dispatch center. ▮▮▮ #1 knew only that the Chief of Police had access to the key for the lock box.

8. From City of Edwardsville LEADS[1] information, between January 2010 through August of 2012, the City had approximately 640 tows for which administrative fees totaling over $180,000 would have been collected.

9. ▮▮▮ #1 had been informed that Chief Bedell had attempted to deposit a check made out to the City of Edwardsville into his personal bank account. The Chief maintained his personal bank account at PNC Bank, a bank other than The Bank of Edwardsville, where the city conducts official business. The teller at the bank advised the Chief that he was not allowed to deposit the check because it was not made payable to him. This upset the Chief and he responded that he was the Chief of Police and could cash the check. The teller alerted the manager. The bank manager told the Chief that he would need to go to the Bank of Edwardsville to cash a check made out to the city.

---

[1] The Illinois Law Enforcement Agencies Data System (LEADS) is a statewide, computerized, telecommunications system, maintained by the Illinois State Police, designed to provide the Illinois criminal justice community with access to computerized justice related information at both the state and national level.

4

10. ▓▓▓▓▓▓▓▓▓▓ #1 had also been informed by a coworker that Chief Bedell had made at least two cash deposits into the Chief's personal account in multiples of $300 ($300, $600, or $900).

11. ▓▓▓▓▓▓▓▓▓▓ #1 informed Affiant that he/she believed Chief Bedell was a gambler.

**Interview of ▓▓▓▓▓▓▓▓▓▓ #2:**

12. On August 5, 2012, ▓▓▓▓▓▓▓▓▓▓ #2 advised Affiant that Chief Bedell came to the Police Department on the previous Monday morning. Chief Bedell entered the dispatch area of the Police Department, took money out of the impound fee lockbox, and left the dispatch area. Bedell was seen leaving the Police Department shortly after.

13. On the previous Tuesday, ▓▓▓▓▓▓▓▓▓▓ #2 witnessed Chief Bedell's secretary "fishing" in the lockbox. When questioned, the secretary advised that the Chief wanted her to get a receipt out of the box for him and that the Chief had taken the key with him. Chief Bedell was off that day.

14. ▓▓▓▓▓▓▓▓▓▓ #2 knew Chief Bedell gambled heavily at the Alton Casino.

15. Both ▓▓▓▓ #1 and ▓▓▓▓ #2 are known to Affiant to be ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ access to the police department and the dispatch area. Both expressed concern at being identified for fear of retaliation.

**Review of Bedell's Personal Bank Records (January 2010-July 2012):**

16. Bedell maintained personal bank account number ▓▓▓▓▓▓ at PNC Bank.

17. Affiant identified 25 cash deposits into Bedell's personal bank account in multiples of $300 ($300, $600, or $900) totaling $9,300.00. There were numerous other cash deposits during the same time period but only multiples of the $300 tow fee were counted for the analysis.

5

18. Bedell made 1371 Online Bill Payments/Electronic Payments totaling $253,975.81. during the reviewed period. Bedell averaged more than 44 Online Bill Payments/Electronic Payments in the amount of $8,192.77 per month during this time frame. The electronic payments could have been made by Bedell from his computer at the police department or from his residence. James S. Bedell has a networked computer at the City of Edwardsville Police Department and has work email. His email address is listed as jbedell@cityofedwardsville.com.

19. From bank records, Affiant identified QuikTrip money order number 14-███ dated 120410 from store 694 in the amount of $300.00 that was signed and deposited into Bedell's personal bank account on December 7, 2010. A note reading "CAR" was handwritten in the "Payment for/ACCT #" portion of the check. "James Bedell" was handwritten in the Pay to the Order of portion of the check. The signature of James Bedell on the money order appears consistent with other signatures by Bedell. Affiant has identified QuikTrip store 694 as the QuikTrip in Edwardsville, Illinois.

20. Affiant analyzed LEADS information as to the impounded tows received by the City of Edwardsville shortly before the deposit by Bedell of the money order into his personal bank account. The individuals who might have paid an administrative fee to the City of Edwardsville near that time frame were interviewed.

**Interview of Zachary Hutson and John Hutson:**

21. LEADS information indicated that the Hutsons had their 1988 Mercury towed by the City of Edwardsville on December 3, 2010. On September 26, 2012, Affiant interviewed Zachary and John Hutson. Zachary was the owner of a 1988 Mercury that was towed and impounded by the Edwardsville Police Department in earlyDecember 2010. John recalled paying a total of $700 to get the vehicle back including the tow and impound fees. Zachary recalled calling his father John to help get the car back. On Saturday Morning, Zachary and John went to the Edwardsville QuikTrip and purchased a $300.00 money order. A review of the calendar indicates that Saturday was December

6

4, 2010. The two took the money order to the police department where a uniformed Police Officer filled the money order out. John identified his signature on a copy of a money order presented to John for review. This was a redacted copy of the aforementioned money order previously located in James Bedell's personal bank records.

22. John recalled the officer writing "CAR" on the money order. Both John and Zachary recalled the Police Officer using a stamp to complete the Pay to the Order of portion of the check. John signed the completed money order.

23. The $300 money order paid to the City of Edwardsville by the Hutsons as an administrative fee for the return of the vehicle was the property of the City of Edwardsville and was inappropriately deposited into Bedell's personal account the following Tuesday, December 7, 2010.



24. From a review of bank records for Bedell's personal account, Bedell made more than 460 ATM withdraws at casino ATMs for over $74,000 during the reviewed time frame of January 2010 through August of 2012. Bedell made withdraws at eight different casinos.

**Review of Bedell's Casino Gaming Records (January 2010-September 2012):**

25. Affiant knew casino gaming records would only show losses/gains if Bedell used a casino player's card. Affiant reviewed gaming records subpoenaed from four casinos. Affiant found that Bedell did not use a player's card at the Argosy Casino in Alton, Illinois and therefore there were no records of Bedell gaming at the Argosy Casino. The Casino Queen, in East St. Louis had records from 2010 indicating Bedell lost more than $18,000 and cycled more than $149,000 through Casino Queen slots. Hollywood Casino had records from 2010 indicating Bedell lost more than $7,000. Harrah's Casino in Maryland Heights, Missouri had records from 2010 through September 2012 indicating Bedell lost more than $105,000.

26. A review of bank records indicates that James S. Bedell uses his home address of 324 Shea Court, Edwardsville, Illinois and therefore there is probable cause to believe that financial records, gambling records and tax records will be found at that address.

27. The City of Edwardsville receives federal funds from several sources. In March of 2012, the City of Edwardsville fire department received a federal FEMA grant for protective clothing in the amount of $117,000. In January of 2010, the City of Edwardsville received federal funds totaling $29,892 as a sub award of federal funds through the Illinois Department of Transportation. In June of 2009, the City of Edwardsville received federal funds totaling $33,987.55 as a sub award of federal funds administered through the Illinois Department of Transportation.

28. For violations of 18 U.S.C. Section 666, the stolen or embezzled funds need not be traceable to the federal funds. *Sabri v. United States*, 541 U.S. 600 (2004).

8

29. Based upon affiant's knowledge, training, and experience, including consultation with other agents who are experienced in the conduct of financial related fraud investigations, I have reason to believe that individuals involved in financial and financially related crimes often maintain records and documents pertaining to their criminal activity. These records and documents are normally kept by these individuals in their residence, vehicles, businesses, or on their person, where they may be readily accessible to that individual. Furthermore, these records are maintained for numerous years. Based on your affiant's knowledge, residences typically contain financial records.

30. Based upon affiant's knowledge, training, and experience, including consultation with other agents who are experienced in the conduct of financial related fraud investigations, I have reason to believe that the use of both personal computers, smart phones, and personal digital assistants or personal data organizers, hereinafter "PDA's," have become pervasive in American Society. I know that personal computers and PDA's are often used to generate correspondence and email correspondence, as well as maintain address books, calendars, and other contact information. I know that personal financial software such as Quicken, Microsoft Money, or similar programs are often used to maintain personal and business financial records such as check registers and to record downloaded bank statements. It is also common for individuals to maintain both personal and business records (including records pertaining to criminal activity) via computer.

## Computer Searches

31. Based on affiant's knowledge, training, experience, and information relayed to me by agents and others involved in forensic examination of computers, I know that:

9

a. Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, digital, magnetic, optical or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units and self contained "laptop" or "notebook" computers or Personal Digital Assistants -- PDAs); internal and peripheral storage devices (such as fixed disks, floppy disks, external hard disks, floppy disk drives and diskettes, tape drives and optical storage devices, thumb-drives, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts, that can be used to restrict access to computer hardware (such as physical lock and keys).

b. Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications, utilities, compilers, interpreters, and communications programs.

c. Computer-related documentation consists of written, recorded, printed, or electronically-stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or programming codes. A password (which is a string of alpha-

10

numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

e. Computer hardware and computer software may be utilized to store information or data in the form of electronic, digital or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment. This media includes, but is not limited to fixed hard drives and removable hard drive cartridges, laser disks, tapes, floppy disks, CD-ROMs, thumb-drives and any other media capable of storing magnetic coding.

32. Based on affiant's knowledge, training, experience, and information relayed to me by agents and others involved in forensic examination of computers, I know that searching and seizing information from computers often requires agents to seize most or all electronic-storage devices, along with related peripherals, to be searched later by a qualified expert in a laboratory or other controlled environment for the following reasons.

a. <u>The volume of evidence.</u> Computer storage devices (like hard disks, diskettes, thumb-drives, tapes, laser disks) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or

11

instrumentalities of crime. This sorting process can take weeks, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

b. <u>Technical requirements.</u> Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification of destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

c. Searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the computer's data in a laboratory or other controlled environment. This is true because of the following:

- The peripheral devices which allow the users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many systems storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the computer as it now operates in order to accurately retrieve the evidence.

12

— In addition, the analyst needs the relevant system software (operating systems, interfaces and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals, or other documentation and data security devices.

33. In light of the concerns outlined above, your affiant hereby requests the Court's permission to seize the computer hardware and associated peripherals that are believed to contain some or all of the evidence described in the warrant and to conduct an offsite search of the hardware for the evidence described, if, upon arriving at the scene, the agents involved in forensic examination of computers conclude that it would be impractical to image or search the computer hardware on-site for this evidence. If such circumstances apply, the government will return the computer equipment within a reasonable amount of time.

34. James S. Bedell drives a Silver 2005 BUICK 4 DOOR, IL REG - K141445 for his employment with the City of Edwardsville and drives that vehicle from the police department to his residence. Any tow funds, receipts or records removed from the police department would be transported in this vehicle.

### Affiant's Conclusion

35. Based on the forgoing, your affiant alleges there is probable cause to believe that within the vehicle described herein, there is presently concealed those items set forth in Attachment A, which constitutes evidence of violations of Title 18, United States Code, Section 666 (embezzlement from a local organization that receives federal funds).

36. Disclosure of the contents of the Applications, Affidavits, and Search Warrants could compromise and jeopardize an ongoing investigation and/or witnesses who have provided information to the United States Attorney's Office.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Derek Wingle, Special Federal Officer
Federal Bureau of Investigation


STEPHEN R. WIGGINTON
United States Attorney

NORMAN R. SMITH
Assistant United States Attorney


State of Illinois )
                  ) SS.
County of St. Clair )


Sworn to before me, and subscribed in my presence on the 28TH day of September 2012, at East St. Louis, Illinois.

_____
DONALD G. WILKERSON
United States Magistrate Judge

## Attachment A
## Items to be Seized

Property which constitutes evidence of the commission of a criminal offense or which is contraband, fruits of the crime, or things otherwise criminally possessed, or which is designed or intended for use or which is or has been used as the means of committing an offense in violation of Title 18, United States Code, Section 666 (embezzlement from a local government that receives federal funds.)

1. Tow records to include records of vehicles towed, impounded, and released or otherwise disposed of, records of administrative fees received to include receipt books, records of the transfer or disbursement of administrative tow fees, records of complaints concerning impounded vehicles and/or the administrative tow fees, records pertaining to notification to owners of towed/impounded vehicles.

2. Policies, memoranda, ordinances, meeting notes or minutes concerning administrative tow fees including the proper handling and disposition of administrative tow fees.

3. Personnel information pertaining to James S. Bedell.

4. Personal financial information pertaining to James S. Bedell to include information related to income, including payroll information or related to expenses, including: tax returns (including drafts and unfiled copies), bank statements, account applications, signature cards, deposit items, cancelled checks, withdrawal items, cash withdrawals, checks to cash, wire transfers, cashier's checks, money orders, traveler's checks, bank checks, official checks, cash advance checks, passbooks, records of safety deposit boxes and keys, monthly statements, investment accounts, foreign bank accounts, and the transfer, expenditure, and obtaining of money, credit card and debit card statements, brokerage account records, stocks and bonds, real

15

estate, and commodities, loan applications and documents, lists of assets, monthly payment slips, receipts, notifications of payments received, mortgage applications and documents, credit checks, and amortization statements, credit card statements, credit card applications.

5. Gambling information/records/receipts pertaining to James S. Bedell.

6. Tax records, information pertaining to James S. Bedell, to include tax records related to income and/or gambling.

7. Cash receipts inventories/records to include records of all cash receipts and disbursements by the City of Edwardsville Police Department from January 1, 2009 to the present.

8. Lock box keys

9. Records, policies, memoranda pertaining to the proper handling of any cash or property in the care of or the property of the City of Edwardsville.

10. United States currency, money orders, and bearer instruments will be inventoried but not seized.

11. All of the foregoing items of evidence described in paragraphs 1-9 above, in whatever form and by whatever means such items may have been created or stored, including any hand-made form, any photographic form or any electrical, electronic, digital or magnetic form, such as any information on an electronic, digital or magnetic storage device like a floppy diskette, hard disk, backup media, CD-ROM, thumb-drive, optical disc, electronic dialer, electronic notebook, as well as printouts or readouts from any digital or magnetic storage device;

12. Computer hardware, including data-processing devices (such as central processing units, desktop computers, self-contained "laptop" or "notebook" computers, Personal Digital Assistants – PDAs, and Smart Phones); internal and peripheral storage devices (such as

fixed disks, floppy disks, external hard disks, floppy disk drives and diskettes, tape drives and optical storage devices, thumb-drives, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, routers, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts, that can be used to restrict access to computer hardware (such as physical lock and keys);

13. Computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, video, web browsers, and communications programs;

14. All computer passwords and data security devices, including encryption devices, chips and circuit boards.